**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 19-cv-0903-WJM-SKC
*Consolidated with Civil Action No. 19-cv-2967-WJM-SKC*

OSCAR FRIAS, and
ZENNA FRIAS ACOSTA,

      Plaintiffs,

v.

AUTO-OWNERS INSURANCE COMPANY,

      Defendant.

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

Before the Court is Defendant Auto-Owners Insurance Company's Motion for Summary Judgment (the "Motion") (ECF No. 70.) For the following reasons, the Motion is granted.

**I. STANDARD OF REVIEW**

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. BACKGROUND[1]

### A.    Introduction

On October 20, 2018, Plaintiffs Oscar Frias ("Mr. Frias") and Zenna Frias Acosta ("Ms. Frias") (jointly, "Plaintiffs") were involved in an automobile collision in New Mexico. Mr. Frias alleges that he suffered a full thickness tear of his distal right bicep tendon in the collision, and he underwent surgical repair of the tendon on November 19, 2018. (ECF No. 3 ¶¶ 10, 12.)  Ms. Frias alleges that she suffered re-injury to her hips where she previously had a bilateral labral tear that required reconstructive surgery, and that she also had soft tissue injuries to her neck and back.  (ECF No. 42 ¶ 10.)  Ms. Frias underwent surgical repair of her hips in May 2019.  (*Id.* ¶ 12.)

### B.    Applicable Policy Provisions

Auto-Owners issued policy number 50-579-084-01 (the "Policy"), effective January 1, 2018, to January 1, 2019, to Mr. Frias.  (ECF No. 70 ¶ 1; ECF No. 70-1.) The Policy's Uninsured Motorist ("UM") coverage is subject to limits of $100,000 per person and $300,000 per occurrence.  (ECF No. 70-1 at 13.)

---

[1] The following factual summary is based on the parties' briefs on the Motion and documents submitted in support thereof.  These facts are undisputed unless attributed to a party or source.  All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

The Policy contains the following relevant provision regarding cooperation:

> 2.  ASSIST AND COOPERATE
>
> a.  You and any person seeking coverage under this policy must cooperate with us in the investigation, settlement or defense of any claim or suit.  This includes submitting to a statement under oath and giving us access to any documents which we request.

(*Id.* at 29.)

Under UM coverage, the insurance policy provides in relevant part:

> 6.  NOTIFY US PROMPTLY
>
> ***
>
> b. Any person making claim must:
>
> (1) give us written notice and documentation of loss.
>
> ***
>
> (3) authorize us to obtain medical reports and other pertinent records.
>
> Failure of any person entitled to Uninsured Motorist Coverage to comply with these provisions shall invalidate the coverage provided by this policy if we show by a preponderance of evidence that we were prejudiced by the delay.

(*Id.* at 39.)

## C.   Material Facts

### 1.   Plaintiffs' Demands for Uninsured Motorist ("UM") Benefits

On February 1, 2019, Mr. Frias submitted a demand letter for UM policy limits to Auto-Owners.  He claimed medical expenses of $26,213.97, which Auto-Owners had already paid, and $14,235 in lost wages attributed to the accident.  Mr. Frias requested the remaining portion of the $100,000 policy limit be issued by February 28, 2019.  In

support of his wage loss claim, five pay stubs were submitted with Mr. Frias's demand. By subtracting the "post-injury average weekly wage" from the "pre-injury average weekly wage" based on the five pay stubs, the demand concluded that Mr. Frias had "incurred consistent wage loss of approximately $949 per week since 10/20/2018." Multiplied by 15 weeks, Mr. Frias demanded $14,235 in lost wages attributed to the accident.

Ms. Frias also submitted a demand for UM policy limits to Auto-Owners dated February 1, 2019.  Ms. Frias requested payment of medical bills for treatment of her neck, back, and hips, and for 98.5 hours of time missed from work.  Ms. Frias requested that the $100,000 policy limit be issued by February 28, 2019.

Ms. Frias's demand included a medical record from Western Orthopaedics stating that she underwent bilateral hip arthroscopies by Brian J. White, M.D., in 2012, following which she "globally was doing very well until she was involved in a motor vehicle accident on October 20, 2018."  In addition to the medical record, Ms. Frias submitted a signed letter from Dr. White stating her hips "did great until a car accident in October."  Ms. Frias also submitted three pay stubs from her employer, Clayton Homes, showing that she missed one week of work after the accident.

On February 14, 2019, Auto-Owners's adjuster, Rebekah Ratzell, wrote to Plaintiffs' counsel requesting additional documentation to evaluate Plaintiffs' policy limit demands.  Regarding Mr. Frias, Ratzell requested pay stubs "leading up to the accident, during the accident time and after."  Regarding Ms. Frias, Ratzell requested "previous medicals back to 2012 as referred to in the notes from Western Ortho or at the very least the last five years before the date of loss for all treating providers" and more

information about her lost-wage claim.  Ratzell requested an extension until March 29, 2019, to respond to Plaintiffs' demands.  Mr. Frias refused to extend the 28-day time limit for Auto-Owners' response to his UM demand, which he set in his demand letter, and filed suit on March 8, 2019.

### 2.   Auto-Owners's Requests for Information

Auto-Owners began its coverage investigation on October 22, 2018.  On January 20, 2019, Mr. Frias submitted a signed authorization for release of medical information to Auto-Owners.  (ECF No. 78-7 at 3.)  On March 7, 2019, Ms. Frias submitted a signed authorization for release of medical information to Auto-Owners.  (ECF No. 78-6.)  The releases did not permit Auto-Owners to request employment information.

On March 14, 2019, Ratzell sent a second letter requesting information pursuant to the policy to evaluate Plaintiffs' UM claims, including "all pay stubs for the past year" for Plaintiffs' wage loss claims, and Ms. Frias's medical records "since January 1, 2012 pertaining to any of the parts of her body that she alleges were injured as a result of the Accident."[2]  In response, Plaintiffs did not produce the requested wage loss documentation or pre-accident records.  Plaintiffs stated that "Ms. Frias has had all prior orthopedic care with Dr. White."  Auto-Owners requested that Plaintiffs provide their wage loss documentation and pre-accident medical information for Ms. Frias, pursuant

---

[2] In Plaintiffs' Response to Movant's Material Facts regarding this fact, they state "Admit. Mr. Frias further states that he had filed suit on March 8, 2019, and so his duties to respond to Defendant's requests were suspended because litigation was pending. . . ."  (ECF No. 77 at 2 ¶ 11; *see also id.* ¶¶ 12, 13.)  Nowhere in their response do Plaintiffs cite authority (binding or non-binding) to support the proposition that their duties to respond to Auto-Owners's requests were suspended because litigation was pending.  "A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point.'" *Phillips v. Calhoun*, 956 F.2d 949, 953-54 (10th Cir.1992) (quoting *Pelfresne v. Village of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir.1990)).  Thus, the Court considers this issue no further.

to the policy's cooperation provision several more times, including on: April 5, 2019, May 13, 2019, June 27, 2019, July 17, 2019, and August 15, 2019.

Mr. Frias did not provide the additional wage-loss documents until five months later, when he was required to by deadlines set in this lawsuit.  Calculating the wage loss claim using the same methodology as the February 1, 2019, demand ("post-injury average weekly wage" minus "pre-injury average weekly wage" multiplied by 15 weeks), the additional pay stubs indicate Mr. Frias incurred wage loss of $496 per week (instead of $949 per week), for a total potential wage loss claim of $7,440 (instead of $14,235 total).

Similarly, despite Auto-Owners' requests, Ms. Frias did not provide pre-accident medical records from, or the name of, her treating provider, Colorado Comprehensive Spine Institute ("CCSI"), until ten months later, and after she filed suit.  The CCSI records reveal Ms. Frias was treated in 2014 for "neck pain, upper back pain, low back pain, [and] hip pain."  She "felt worse after the surgery" in 2012 with Dr. White.  "The cause of pain is reported as an MVA, a fall, related to a previous surgery."  She was prescribed a muscle relaxant, Lyrica, and oxycodone for pain relief.  Other records from CCSI that were disclosed in litigation document "constant" pain in Ms. Frias's "hips and back" at a 5 to 8 out of 10 despite months of treatment and prescription drugs.  Regarding her lost-wage claim, Ms. Frias did not provide any other pay stubs.

3.   Auto-Owners Paid UM Benefits to Plaintiffs Subject to a Reservation of Rights

On October 24, 2019, Auto-Owners transmitted a check with the remainder of the $100,000 UM policy limit to Mr. Frias for wage loss and noneconomic damages, subject to a reservation of rights.  On the same date, Auto-Owners transmitted a check in the

amount of $21,999.99 in UM benefits to Ms. Frias for wage loss and noneconomic

damages, for a total of $42,757.42, subject to a reservation of rights.

     4.    <u>Ms. Frias's Response to Auto-Owners First Set of Discovery Requests</u>

Auto-Owners served its First Set of Discovery Requests to Ms. Frias on March

10, 2020.  In those requests, Auto-Owners asked Ms. Frias to admit the following

statement in its Request for Admission 10: "Defendant acted reasonably in handling

your Claim."  Ms. Frias did not seek an extension of time to respond to Auto-Owners'

First Set of Discovery Requests of Request for Admission 10.  Ms. Frias did not *timely*

answer or object to Auto-Owners' Request for Admission 10.  (ECF No. 70 at 7 ¶ 25

(emphasis added).)  Ms. Frias disagrees with Auto-Owners, stating that she did respond

to the requests for admission and denied said request.[3]  (ECF No. 77 at 4 ¶ 25.)

### III. PROCEDURAL HISTORY

Plaintiffs filed their lawsuits against Auto-Owners in the Arapahoe County District

Court; Mr. Frias filed his lawsuit on March 8, 2019 (ECF No. 3), and Ms. Frias filed her

lawsuit on October 9, 2019 (ECF No. 42).  Plaintiffs both alleged three claims: (1)

breach of contract-UIM[4] benefits); (2) first party statutory claim for unreasonable

delay/denial of benefits under Colorado Revised Statutes § 10-3-1116[5]; and (3)

---

[3] Ms. Frias provides no citation to the record in connection with her response to this fact. Further, Ms. Frias does not dispute that she did not *timely* answer or object to Auto-Owners's Request for Admission 10.

[4] Although Plaintiffs bring claims for "UIM benefits," which acronym indicates "underinsured," Plaintiffs allege the tortfeasor who caused the collusion was "uninsured."  (ECF No. 3 ¶ 17; ECF No. 42 ¶ 6.)  Thus, it appears as though Plaintiffs meant to bring claims for UM ("uninsured") benefits.

[5] Plaintiffs bring these claims under Colorado Revised Statutes § 10-3-1116, which is the section providing for "Remedies for unreasonable delay or denial of benefits--required contract provision--frivolous actions--severability--rules."  However, Colorado Revised Statutes § 10-3-1115 is the provision which prohibits "unreasonabl[e] delay or den[ial] [of] payment of a claim for

common law bad faith.  (ECF Nos. 3, 42.)  Auto-Owners answered both of Plaintiffs'
Complaints, asserting the affirmative defense of failure to cooperate in both Answers.
(ECF No. 28 ¶ 9, ECF No. 43 ¶ 7.)

On March 26, 2019, Auto-Owners removed Mr. Frias's case (ECF No. 1), and on
October 17, 2019, Auto-Owners removed Ms. Frias's case (Civil Action No. 19-cv-2967-
DDD-SKC (ECF No. 1)), both pursuant to this Court's diversity jurisdiction, 28 U.S.C. §
1332(a).  The Court consolidated these civil actions on November 14, 2019.  (ECF No.
41.)

On November 30, 2020, Auto-Owners filed the Motion, arguing it is entitled to
summary judgment on all claims.  (ECF No. 70.)  On January 11, 2021, Plaintiffs filed a
response in opposition (ECF No. 77), to which Auto-Owners replied (ECF No. 83).
Auto-Owners has also filed Notices of Supplemental Authorities in support of its Motion.
(ECF Nos. 84, 95.)

## IV. ANALYSIS

**A.    Breach of Contract Claims**

1.    <u>Mr. Frias's Breach of Contract Claim</u>

As an initial matter, Auto-Owners argues that Mr. Frias's breach of contract claim
fails as a matter of law because Auto-Owners paid him the $100,000 policy limit in UM
coverage after completing its investigation of his claim.  (ECF No. 70 at 18.)  Moreover,
in its reply, Auto-Owners points out that in their response, Plaintiffs make no argument
against dismissing Mr. Frias's breach of contract claim on this basis.  (*See generally*

---

benefits owed to or on behalf of any first-party claimant."  Thus, the Court will analyze case law
pertaining to the latter section in addressing the viability of these claims later in this Order.  *See
infra* Part IV.B.

ECF No. 77; ECF No. 83 at 18.)

The undersigned has found in another insurance action that "Because [the defendant] has already paid the full amount of [the plaintiff's] UIM coverage, there is no remaining claim for breach of contract." *Stamey v. Nat'l Gen. Ins. Co.*, 2016 WL 8540310, at *2 (D. Colo. Sept. 22, 2016). The same principle applies here. Therefore, given this authority and Plaintiffs' lack of response in opposition on this issue, the Court finds that Mr. Frias's breach of contract claim must be dismissed as a matter of law. Nonetheless, the Court will analyze Mr. Frias's purported failure to cooperate because such analysis affects the viability of Mr. Frias's remaining statutory delay/denial and common law bad faith claims.

      2.   <u>Duty to Cooperate</u>

In their Complaints, Plaintiffs assert claims for breach of the Policy based on Auto-Owners's alleged failure to pay UM benefits owed as a result of the collision. (ECF Nos. 3, 42.) In its Answers to each Complaint, Auto-Owners raises the affirmative defense of failure to cooperate, arguing: (1) regarding Mr. Frias that "Plaintiff may not be entitled to UM benefits under the Policy because Plaintiff may have failed to cooperate with the investigation of his claim, as is required by the Policy, and this breach of the cooperation clause may have prejudiced Auto-Owners in its investigation and evaluation of the claim . . . " (ECF No. 28 ¶ 9), and (2) regarding Ms. Frias that "Plaintiff's claims are barred, in whole or in part, because she has breached her duty to cooperate under the Policy, by, for example, failing to provide requested information to Auto-Owners regarding her alleged damages, such as complete documentation and information regarding Plaintiff's wage loss and medical history and treatment" (ECF No. 48 ¶ 7). Solely for the purposes of deciding this Motion, the Court assumes that Ms. Frias has

established the elements of her breach of contract claim,[6] and proceeds to the question of whether there is a genuine issue of material fact regarding whether Auto-Owners has satisfied its affirmative defense of failure to cooperate.

"A cooperation requirement in an insurance policy is 'valid and enforceable.'" *Windhorst v. State Farm Mut. Auto. Ins. Co.*, Court of Appeals No. 11CA1045, at 11 (Colo. App. May 24, 2012)[7] (quoting *Farmers Auto. Inter–Insurance Exch. v. Konugres*, 202 P.2d 959, 962 (1949)).[8] "Importantly, whether there has been cooperation on the part of an assured with the company . . . is usually a question of fact." *Cribari v. Allstate Fire & Cas. Ins. Co.*, 375 F. Supp. 3d 1189, 1198 (D. Colo. 2019), *aff'd*, 2021 WL 2255008 (10th Cir. June 3, 2021) (quoting *Konugres*, 202 P.2d at 963) (internal quotation marks and alterations omitted); *see also Hansen v. Barmore*, 779 P.2d 1360, 1364 (Colo. App. 1989) ("Generally, the question of whether the insured has violated his insurance policy by failing to cooperate with the insurer is a question of fact for the trial court.").

"Non-cooperation constitutes breach only if material and substantial

---

[6] The Court's determination that Mr. Frias's breach of contract claim fails as a matter of law remains. *See supra* Part IV.A.1. However, as explained above, the Court nonetheless evaluates whether Mr. Frias failed to cooperate for the purposes of subsequently evaluating his statutory denial/delay and common law bad faith claims.

[7] This Colorado Court of Appeals opinion is unpublished, and neither Westlaw nor LexisNexis provide a full copy of the opinion. Nonetheless, the Court has obtained a copy of the opinion from the state court docket and cites to the page numbers of that document.

[8] In conducting legal research, the Court became aware that effective September 14, 2020, Colorado enacted Colorado Revised Statute § 10-3-1118, "Failure-to-cooperate defense," which explains the conditions which must be met before the failure to cooperate defense is asserted in a court of law or an arbitration. However, this statute was enacted after the events at issue in these cases and does not apply to the Court's analysis of the Motion. The Court notes that neither party invokes this statute, provides it as supplemental authority, or argues that it applies to the analysis of the Motion.

disadvantage to the insurer is proved." *Id.* (internal quotation marks and citation omitted).  "[A]ny formal, inconsequential or collusive lack of cooperation will be immaterial." *Id.* (citation omitted).  In addition, what might appear initially to be a breach of the cooperation clause "may be excused, if it develops that the failure of the assured was due to mistake, and that there was no exercise of bad faith on his part." *Id.* "However, where the facts are undisputed and only one reasonable inference may be drawn from them, cooperation may be resolved as a matter of law." *Windhorst*, Court of Appeals No. 11CA1045, at 11 (citing *ITT Specialty Risk Servs. v. Avis Rent A Car Sys., Inc.*, 985 P.2d 43, 46 (Colo. App. 1998) (addressing failure to give insurer timely notice of claim)).

In *Windhorst*, the court explained that "in a first-party claim where an insured seeks coverage for a loss already sustained, such prejudice is determined by whether the insurer has been able to complete a reasonable investigation with regard to whether the insured's claim is valid." *Id.*

> If the insured's refusal to cooperate prevents the insurer from completing such a reasonable investigation, prejudice should be found to exist.  Specifically, it has been held that the insurer can deny coverage, following an insured's refusal to provide documents reasonably requested by the insurer, on the basis that the insurer has been prejudiced because the insured's refusal prejudices the insurer by putting the insurer in the untenable position of either denying coverage or paying the claim without the means to investigate its validity.

*Id.* (citing 1 *Insurance Claims and Disputes* 5th § 3:2).

Whether documents have been "reasonably requested" by an insurer depends on their materiality and relevancy.  *Id.* (citing *Farmer v. Allstate Ins. Co.*, 396 F. Supp. 2d 1379, 1382–83 (N.D. Ga. 2005) (rejecting plaintiff's argument that financial

information she failed to provide was not relevant: "Where an insurer suspects that a claim might be fraudulent, information relating to the insured's recent income and sources of income is material and relevant to the suspicion of fraud and to the insured's possible financial motive."); *Rymsha v. Trust Ins. Co.*, 746 N.E. 2d 561, 564 (Mass. App. Ct. 2001) (financial document was "material and relevant"); *Keith v. Allstate Indem. Co.*, 19 P.3d 1077, 1079–80 (Wash. Ct. App. 2001) (same)).  Where the insured's failure to provide some of the requested records is undisputed, the court may determine their relevance to the insurer's investigation as a matter of law.  *Id.* (citing *Doerr v. Allstate Ins. Co.*, 121 F. App'x 638 (6th Cir. 2005) (affirming trial court's determination that financial records requested by insurer and not provided by insured were relevant to insurer's investigation and failure to provide them breached insured's duty to cooperate)).

Here, Auto-Owners contends that Plaintiffs breached their duty of cooperation under the Policy, which materially and substantially disadvantaged Auto-Owners.  (ECF No. 70 at 1–2.)  Specifically, Auto-Owners argues that it was not provided access to critical information relevant to Plaintiffs' UM benefits claims such that Auto-Owners was put "in the untenable position of either denying coverage or paying the claim without the means to investigate its validity."  (*Id.* (citing *Walker v. State Farm Fire & Cas. Co.*, 2017 WL 1386341, at *4 (D. Colo. Feb. 23, 2017), *report and recommendation adopted*, 2017 WL 1386346 (D. Colo. Mar. 17, 2017) (internal quotations omitted)).)  The Court first addresses Auto-Owners's arguments regarding Mr. Frias's failure to cooperate and next addresses the arguments regarding Ms. Frias.

a.   *Mr. Frias Breached the Policy by Withholding Lost-Wage Information*

When Mr. Frias filed his claim for UM benefits on February 1, 2019, he sought payment of $14,235 for 15 weeks of lost wages attributed to the collision and set a deadline for payment of February 28, 2019.  (ECF No. 70 at 10; ECF No. 70-2.) However, Mr. Frias only submitted five pay stubs with his demand.  (*Id.*)  Auto-Owners explains the calculation of Mr. Frias's demand: "By subtracting the 'post-injury average weekly wage' from the 'pre-injury average weekly wage' based on the five pay stubs, the demand concluded that Mr. Frias had 'incurred consistent wage loss of approximately $949.00 per week since 10/20/2018.'  Multiplied by 15 weeks, Mr. Frias demanded $14,235.00 in lost wages attributed to the accident."  (*Id.*)  In response to this demand, Ratzell requested additional pay stubs "leading up to the accident, during the accident time and after."  (*Id.* at 11.)  In addition, Ratzell requested an extension until March 29, 2019 to respond to Mr. Frias demand because she had requested the additional wage documentation.  (*Id.*; ECF No. 70-6.)

In response, Mr. Frias refused to extend the arbitrary 28-day time limit he had set in his demand letter and filed suit on March 8, 2019.  (ECF No. 3; ECF No. 70 at 11.) Auto-Owners again requested the lost-wage information on March 14, April 5, May 13, and June 27, 2019.  (ECF No. 70 at 11; ECF Nos. 70-9–70-13.)  Despite Auto-Owners's requests, Mr. Frias did not provide the additional information—16 total pay stubs—until July 18, 2019, over five months later when the Federal Rules of Civil Procedure required their production in this litigation.  (ECF No. 70-14.)  As Auto-Owners underscores in its reply, there is no evidence the 11 additional pay stubs provided months later were unavailable to Mr. Frias when Ratzell originally requested them.

(ECF No. 83 at 3.)  And even if the 11 pay stubs were unavailable, Mr. Frias refused to respond to the request for that information, rather than stating the information was unavailable, and instead filed this lawsuit.  (*Id.*)

A review of the 16 total pay stubs provided in comparison with the five pay stubs initially provided reveals why Mr. Frias's extended noncooperation materially and substantially harmed Auto-Owners's ability to fully and accurately adjust his claim.  In the Motion, Auto-Owners provides a table (which the Court will not reproduce here) which demonstrates that the five pay stubs initially provided inflated Mr. Frias's wage loss claim by nearly double.  (ECF No. 70 at 11–12.)  As Auto-Owners explains, by calculating the wage loss claim using the same method as the February 1, 2019, demand ("post-injury average weekly wage" minus "pre-injury average weekly wage" multiplied by 15 weeks), the additional pay stubs indicate Mr. Frias incurred wage loss of $496 per week, for a total potential wage loss claim of $7,440.  Through this method of cherry-picking the pay stubs to provide to Auto-Owners, and by omitting the 11 pay stubs and only providing them several months later after he sued Auto-Owners, Mr. Frias artificially increased his alleged damages by nearly double.

In addition, Auto-Owners correctly emphasizes that not only do the additional pay stubs provide critical information regarding the amount of lost wages accrued by Mr. Frias, but that they also provide relevant information about Mr. Frias's ability to work after the 2018 accident and his November 2018 bicep surgery.  (*Id.* at 13.)  The pay stubs demonstrate that Mr. Frias continued to work after the accident, including some overtime, and that he returned to work full-time only two weeks after the surgery.  The Court agrees that this information is critical to Auto-Owners's evaluation of Mr. Frias's

lost-wage claim and other categories of possible damages and demonstrates Mr. Frias's

failure to cooperate. *See Polland v. State Farm Mut. Auto. Ins. Co.*, 2019 WL

10258801, at *7 (D. Colo. Oct. 25, 2019), *reconsideration denied*, 2020 WL 6799934 (D.

Colo. Nov. 19, 2020) (finding insured failed to cooperate as a matter of law by failing to

provide the entirety of wage and medical information requested to insurer).

> b.    *Ms. Frias Breached the Policy by Withholding Relevant Medical and Lost-Wage Information*

Next, the Court addresses Auto-Owners's argument that by failing to provide pre-

accident medical records and sufficient documentation to support her lost-wage claim,

Ms. Frias failed to cooperate as a matter of law.  (ECF No. 70 at 13–15.)  On February

14, 2019, Ratzell wrote a letter to Plaintiffs requesting Ms. Frias's "previous medicals

back to 2012 as referred to in the notes from Western Ortho or at the very least the last

five years before the date of loss for all treating providers."  (ECF No. 70-6 at 3.)  In

addition, Ratzell requested additional information regarding Ms. Frias's lost-wage claim,

including information showing an actual advice check number and regarding whether

Ms. Frias was paid weekly or bi-weekly, and noting that the rest of the hours Ms. Frias

claimed as time missed from work was still being investigated at the time.  (*Id.*)  Ratzell

also requested an extension of time until March 29, 2019 to review the claim due to the

missing information.  (*Id.*)

On March 14, 2019, Ratzell sent a second letter requesting information, including

"all pay stubs for the past year" for the wage loss claim and Ms. Frias's medical records

"since January 1, 2012 pertaining to any of the parts of her body that she alleges were

injured as a result of the Accident."  (ECF No. 70-7 at 23.)  The letter explained the

Policy's cooperation and notice provisions.  (*Id.* at 17–19.)  On at least five other

occasions, Auto-Owners requested the wage loss documentation and pre-accident medical information.  (ECF No. 70 at 5 ¶ 13.)

In connection with her demand for UM benefits, Ms. Frias submitted a medical record from Western Orthopaedics stating that she underwent bilateral hip arthroscopies by Dr. White in 2012.  (ECF No. 70 at 4 ¶ 7.)  After the procedure, she "globally was doing very well until she was involved in a motor vehicle accident on October 20, 2018."  (*Id.*; ECF No. 70-4 at 5.)  Ms. Frias also submitted a signed letter from Dr. White stating that her hips "did great until a car accident in October."  (ECF No. 70-4 at 7.)

However, it is undisputed that Ms. Frias did not provide pre-accident medical records from, or the name of, her treating provider, CCSI, until 10 months later—after she filed suit against Auto-Owners.  (ECF No. 70 at 6 ¶ 16; ECF No. 77 at 3 ¶ 16.)  Moreover, it is undisputed that the CCSI records show that Ms. Frias was treated "in 2014 for 'neck pain, upper back pain, low back pain, [and] hip pain.'  She 'felt worse after the surgery' in 2012 with Dr. White.  'The cause of pain is reported as an MVA, a fall, related to a previous surgery.'  She was prescribed a muscle relaxant, Lyrica, and oxycodone for pain relief."  (ECF No. 70 at 6–6 ¶ 17; ECF No. 77 at 3 ¶ 17.)  Auto-Owners emphasizes that other CCSI records from May 2014 note "constant" pain in Ms. Frias's hips and back at a "5 to 8 out of 10 despite months of treatment and prescription drugs."[9]  (ECF No. 70 at 7 ¶ 18; ECF No. 70-16 at 2.)

In contrast to the CCSI records, it is undisputed that the records Ms. Frias

---

[9] In the response, Ms. Frias disputes in part Auto-Owners's statement of fact regarding this medical document.  (ECF No. 77 at 3–4 ¶ 18.)  However, the Court reviewed the medical record and finds it says what Auto-Owners states it says regarding Ms. Frias's level of pain.

submitted with her demand for benefits contain a letter from Dr. White stating that her hips "did great until a car accident in October."  (ECF No. 70 at 4 ¶ 7; ECF No. 77 at 2 ¶ 7.)  The Court agrees with Auto-Owners's assertion that the CCSI records contradict those submitted in connection with Ms. Frias's UM demand and are thus material.

Regarding Ms. Frias's lost-wage claim, in her demand for benefits, she submitted a request for payment for 98.5 hours of time missed from work, including three pay stubs for support.  (ECF No. 70 at 4 ¶ 6; ECF No. 70-4 at 3; ECF No. 70-5.)  According to Auto-Owners, the three pre-accident pay stubs show that Ms. Frias worked 33 hours per week on average before the accident.  (ECF No. 70 at 14.)  But, inexplicably, the February 14, 2019 UM demand requested payment for 40 hours of missed work the week following the accident, plus 58.5 hours supported by no documentation.  (ECF No. 70 at 14 (citing ECF No. 70-5).)  As noted above, Auto-Owners requested documentation to support Ms. Frias's lost-wage claim "at least seven times."  (ECF No. 70 at 14 (citing *id.* at ¶¶ 9, 11, 13).)  It is undisputed that Ms. Frias did not provide any other pay stubs in response to these requests.  (ECF No. 70 at 7 ¶ 19; ECF No. 77 at 4 ¶ 19.)

While it is true that Ms. Frias provided a signed medical authorization to Auto-Owners, that release could not be used to collect pre-accident records without the names of Ms. Frias's medical providers.  Moreover, the release did not allow Auto-Owners to request employment information.[10]  (ECF No. 78-6.)  Plaintiffs' arguments

---

[10] Plaintiffs make much of the fact that Auto-Owners did not check the box that would have allowed it to seek employment records on the release forms.  (ECF No. 77 at 21.)  However, Ratzell explained that she has had difficulties before obtaining employment records *even with* an employment authorization.  (ECF No. 77 at 14 ¶ 35.)  Ratzell testified that even had she checked the box for employment authorization, "it would not have mattered or made a difference for her evaluation because, in her experience, employers do not respond to the

that Auto-Owners shirked its duty to investigate Ms. Frias's claim miss the point by ignoring the crucial, undisputed fact that Ms. Frias did not disclose the name of CCSI until after she sued Auto-Owners.  (ECF No. 70 at 14; ECF No. 77 at 19.)  Based on the foregoing, the Court finds that Auto-Owners has made a prima facie demonstration that both Mr. Frias and Ms. Frias failed to cooperate as a matter of law under the Policy. *See Ma v. Auto-Owners Ins. Co.*, 2021 WL 2473898, at *9 (D. Colo. June 17, 2021) (finding insurer met its prima facie burden to demonstrate that plaintiffs failed to cooperate by not providing adequate documentation of hailstorm damage under insurance policy); *Polland*, 2019 WL 10258801, at *7 (granting summary judgment in insurer's favor where insured's failure to cooperate materially and substantially disadvantaged insurer).

Under these circumstances, "the burden shifts to [Plaintiffs] to put forth sufficient evidence that a reasonable jury could find that [they] did not fail to cooperate under the terms of [their Policies]."  *See id.* (citing *Anderson*, 477 U.S. at 248).  For the following reasons, the Court finds that Plaintiffs have failed to provide any competent summary judgment evidence beyond mere conclusory statements and attorney argument which directly speak to this issue, and thus, have not carried their burden.

The Court preliminarily observes that in response to the Motion, Plaintiffs

---

requests for employment records." (*Id.*)  Thus, it is logical and consistent that Ratzell separately requested additional information in the form of pay stubs from Plaintiffs themselves.

Moreover, the undisputed evidence shows that after these requests, Plaintiffs refused to provide the employment information for several months.  On July 17, 2019, after Plaintiffs had not provided the requested information, Auto-Owners requested a signed employment authorization for Ms. Frias so it might try to obtain the information itself.  (ECF No. 70-12 at 7.) Thus, Plaintiffs' arguments that the release forms demonstrate that a genuine issue of material fact exists regarding their cooperation with Auto-Owners's requests for additional employment information are without merit.

concede nearly every material fact set forth by Auto-Owners.  (ECF No. 77 at 1–4.)

Despite these admissions, Plaintiffs devote numerous pages to setting forth irrelevant

factual assertions and unsupported legal arguments, which as Auto-Owners points out,

"have already been rejected by this Court."  (ECF No. 83 at 1–2.)  Specifically, Plaintiffs

argue that: the Policy does not require them to provide medical records, pay stubs, a

provider list, or any other information to Auto-Owners (ECF No. 77 at 17–20); Plaintiffs

fully complied with their obligations under the Policy, and particularly provided signed

medical and employment releases (*id.* at 20–21); Auto-Owners has not demonstrated

that they acted in bad faith (*id.* at 21–22); Auto-Owners should only be permitted to

deny a discrete component of their claims (*id.* at 25); and Auto-Owners breached the

contract first by failing to reasonably investigate Plaintiffs' claims (*id.* at 25–26).

However, the Court has reviewed each of these arguments and concludes that they

constitute unsuccessfully attempts to dodge the fundamental point that Auto-Owners

drives home: that Plaintiffs failed to provide all relevant wage and medical information

until several months after the information was requested and after they had filed suit.

Plaintiffs' arguments do not refute this definitive issue and are thus without merit.

       c.     *Plaintiffs' Contractual Breaches Materially and Substantially*
             *Disadvantaged Auto-Owners*

Despite Plaintiffs' conclusory arguments and deflections regarding Auto-

Owners's actions in requesting additional documentation to support Plaintiffs' UM

claims, the Court finds that Plaintiffs' failure to cooperate "prejudice[d] [Auto-Owners] by

putting [Auto-Owners] in the untenable position of either denying coverage or paying the

claim without the means to investigate its validity."  *See Polland,* 2020 WL 6799934, at

*5 (D. Colo. Nov. 19, 2020) ("failure to provide information material to allowing an

insurer to complete its investigation is, alone, enough to meet this requirement, because it puts Defendant in the position of either denying coverage or paying a claim without being able to reasonably investigate the validity of the claim"); *Walker*, 2017 WL 1386341, at *8 (citation omitted); *State Farm Mut. Auto. Ins. Co. v. Secrist*, 33 P.3d 1272, 1275 (Colo. App. 2001) (explaining that an insurer has been materially and substantially disadvantaged where the insured has acted in a way that has an "adverse effect on the insurer's defense, settlement, or other handling of the claim").

As explained thoroughly above, the medical and employment information Plaintiffs initially provided to Auto-Owners, which prompted Auto-Owners's repeated subsequent requests for more information, "painted an inaccurate picture of their damages."  (ECF No. 83 at 16.)  Without the requested lost-wage documents and pre-accident medical records, Auto-Owners could not fully evaluate Plaintiffs' damages. Thus, the Court concludes that Plaintiffs' failure to cooperate caused a material and substantial disadvantage to Auto-Owners, and consequently, Auto-Owners is entitled to summary judgment with respect to Plaintiffs' breach of contract claims.  *See Secrist*, 33 P.3d at 1275 (affirming summary judgment in insurer's favor where insured failed to respond to insurer's letters advising him of his duty to cooperate).

**B.      Statutory Delay/Denial and Common Law Bad Faith Claims**

Plaintiffs also assert statutory delay/denial and common law bad faith claims. First, in Colorado, a person "engaged in the business of insurance shall not unreasonably delay or deny payment" to an insured.  Colo. Rev. Stat. § 10-3-1115(1)(a).  To establish a claim under § 10-3-1115, a plaintiff "must therefore show that: (1) benefits were owed under the policy and (2) defendant unreasonably delayed or denied payment of plaintiff's claim."  *TBL Collectibles, Inc. v. Owners Ins. Co.*, 285 F.

Supp. 3d 1170, 1201 (D. Colo. 2018).

Because there is no genuine issue of material fact as to whether Plaintiffs failed to cooperate, the Court finds that Auto-Owners's actions were reasonable as a matter of law. *See Polland*, 2019 WL 10258801, at \*7. Further, because Plaintiffs' failure to cooperate "vitiates [their] coverage" under the Policy, and as a result Auto-Owners owes them no benefits, their statutory delay/denial claims fail as a matter of law. *Id.* As a result, the Court finds that Auto-Owners is entitled to summary judgment on Plaintiffs' statutory delay/denial claims.

Next, "[t]he requirements of a common law bad faith claim under Colorado law are heightened in comparison to those of a statutory bad faith claim." *Nyborg v. State Farm Mut. Auto. Ins. Co.*, 2021 WL 662305, at \*3 (D. Colo. Feb. 19, 2021). An insurer must deal in good faith with its insured. *Zolman v. Pinnacol Assurance*, 261 P.3d 490, 496 (Colo. App. 2011) (citing *Am. Family Mut. Ins. Co. v. Allen*, 102 P.3d 333, 342 (Colo. 2004)). "Due to the 'special nature of the insurance contract and the relationship which exists between the insurer and the insured,' an insurer's breach of the duty of good faith and fair dealing gives rise to a separate cause of action arising in tort." *Goodson v. Am. Standard Ins. Co.*, 89 P.3d 409, 414 (Colo. 2004) (quoting *Cary v. United of Omaha Life Ins. Co.*, 68 P.3d 462, 466 (Colo. 2003)). A plaintiff must show that the insurer's conduct was unreasonable and that the insurer acted with knowledge or reckless disregard that its conduct was unreasonable. *See Travelers Ins. Co. v. Savio*, 706 P.2d 1258, 1272, 1274 (Colo. 1985).

Because the reasonableness of the insurer's conduct is an element of Plaintiffs' common law bad faith claims, and because it has been established that given Plaintiffs'

failure to cooperate, Auto-Owners's conduct was reasonable as a matter of law, the Court finds that there is no genuine issue of material fact as to Plaintiffs' common law bad faith claims.  *See Polland*, 2019 WL 10258801, at *8 (finding defendant entitled to judgment as matter of law on plaintiff's common law bad faith claim where plaintiff failed to cooperate).  Thus, Auto-Owners is entitled to summary judgment on Plaintiffs' bad faith claims.[11]

## V. CONCLUSION

Accordingly, for the reasons stated, the Court ORDERS as follows:

1. Defendant Auto-Owners Insurance Company's Motion for Summary Judgment (ECF No. 70) is GRANTED in its entirety;

2. The Clerk shall enter judgment in favor of Defendant and against Plaintiffs in Civil Action No. 1:19-cv-903-WJM-SKC and Civil Action No. 19-cv-2967-WJM-SKC;

3. Defendant shall have its costs upon compliance with D.C.COLO.LCivR 54.1; and

4. The Clerk shall terminate both actions.

Dated this 2nd day of September, 2021.

BY THE COURT:

William J. Martinez
United States District Judge

---

[11] Given the Court's ruling on these claims, the Court need not address Auto-Owners's other arguments that by failing to timely respond to Auto-Owners's discovery requests, Ms. Frias admitted in discovery that it acted reasonably in connection with her claims.  (ECF No. 83 at 19.)